Mr. Lester was accused of stealing from his employer. His defense was that he didn't steal, that he instead purchased inventory for his employer and to effectuate his right, his Sixth Amendment right to present a defense, Mr. Lester sought a Rule 17c subpoena from his employer for the records that would prove his innocence, that would prove that inventory was received, albeit outside the normal course of business for his employer. District Court denied his request. His request was extremely specific. He asked for several different accounting items, he asked for shipping labels, he explained why he would be privy to these things because he was the CFO and the controller of the company at that time. Just a minute, before we get to all of that, that was denied, correct? It was. And just a minute, District Court said there was unspecified representations regarding fairly broad categories of documents, just as such as are sought by the pending application are insufficient to justify the issuance. And it was denied without prejudice, right? It was. So did one ever make another application? Well, I assume the Court knows that he did make one post-trial and the difference is he didn't make one pre-trial. He didn't. And I don't know what he would have done. And, you know, the government doesn't suggest in their brief what should have been done to sort of buttress this case. Did he have an exemplar of what he was seeking, and didn't he bring that up at the post-trial? I don't know of any authority where you have to actually give the Court a comment. Did I ask you about authority? No, you did not. Could I ask you whether he had a document? He did have one in discovery. He had a document of exactly what he wanted, and he didn't add that in a second motion for a subpoena and say, that's the kind of document I want, Judge. Did he? No, he didn't. Well, he could have been more specific, could he not, by showing the document that he wanted to the judge. And he didn't do it for strategic reasons, because he wanted to ambush the prosecution. I completely disagree. He's played it and lost. It is the goofiest theory ever that someone would leave out their best piece of information, throw the trial, come back after trial and say, wait, can I have a do-over and nap? Are you claiming ineffective assistance of counsel? No, I'm not. Because I don't believe in this discovery trap theory. This application The problem comes, and I appreciate that you're saying you don't believe in it, but the problem comes that we have a standard of review. And that standard of review is abuse of discretion. Is it, though? Yes, it is. That's exactly what it is. Not for a constitutional question, Your Honor. Well, what are you going to do with Ochoa? Ochoa. Ochoa. It says the abuse of discretion standard is applicable even where the I think Ochoa is limited to its facts in Ochoa. So now you want to limit Ochoa, because it doesn't agree with you. The bottom line is, with an abuse of discretion standard, that's why you're getting these questions. And I don't see exactly why this is an abuse, especially when one says without prejudice. What else could he have added? I guess the answer is the same. You know, the thing is, this opinion is directed to Hylands, who was not confused in the least. They knew exactly what he was talking about. But if you make that argument, then it becomes the government has nothing. If you're making that argument, then why is the government, why do you, there is absolutely no Brady duty on the government to turn anything in. If you're saying Hylands should have turned it in. I mean, it's supposed to be the government who is going to turn in any Brady material. So if you're making an argument and saying, well, Hyland knew, it has to be the government who knows what it is they're going to present to you. Sure. There's a good answer to that. And this is the answer. One is that the government and Hylands counsel were working together. There's a civil trial still pending, pending the outcome of this appeal. I've interfaced with Mr. Lester's civil counsel. Two, Mr. Lester asked for these items from the government, and the government said, look, these are privileged. They're work products. So the government didn't know about them. Three, there's a Sixth Circuit case in my brief that's Jim Jamjook, and that is that Ivan the Terrible case, where in that case, the defendant wanted evidence that tended to show he was not Ivan the Terrible. OIC or some other investigative agency had that evidence, and the DOJ said, oh, that's not us. We don't have it. And the Sixth Circuit said, look, the left hand can't say to the right hand, we're separate entities. And I don't even think we get to that point, because the government didn't know what they were supposed to turn over, because the lawyer wasn't specific enough with the court. Didn't they know? And didn't say. They did turn it over. They actually turned over one of these in discovery. That's where that one came from. I think there were two additional ones that were produced as some sort of post-trial investigation that I wasn't part of. I wasn't trial counsel below. But the government knew what it was. And I don't think you have to teach accounting classes at Boise State University to know that this is an accounting thing. If you Google this term, this physical account adjustment reports, a simple two-second Google search will tell you what it is. And the thing is, is his application is extremely specific, and it's not just about these. It's also about shipping labels and some pretty basic things. And the standard that the district court used to deny it was George, which is this goofy bank robbery case where the defendant made a very vague phishing expedition that was conceded by his counsel below to be just that, a phishing expedition. So in terms of the – I want to go back to Judge Smith's question about the standard review. I think it ought to be different. I think it's come from Fields. And that Fields case, that's the Wells Fargo case. That's the case cited by the government in that case. Well, I have Fields, USP Fields. Sure. I have Nixon. I have Ochoa. I just picked Ochoa because that's the Ninth Circuit case. But Fields is also, I believe, a Ninth Circuit case. It is a Ninth Circuit case. But it deals with sought from a third party rather than from the U.S. Right. And that is, this is sought from a third party. I understand. But there's some privity, and I think there might have been in that case. That was the Wells Fargo. The defendants there sought some statements from Wells Fargo. And the district court actually granted the subpoena. Wells Fargo appealed and won at this court in a one-page opinion with almost no analysis at all, citing Nixon. And commentators ex post have looked at Fields and said, what does this mean? Does this mean that Nixon applies? Does it mean that Rule 17 just doesn't apply to impeachment materials? Because that seems to be the tenor of the opinion, is that latter idea that it's just impeachment. But in this case, when it goes to the court. Did anybody ever say what the documents they wanted, that they exist? Well, yes. Where? After the, it's, it's. After the trial. After the trial. Because the court actually granted them. Before the trial, did they ever say the documents exist? Yes. There were some testimony. After the trial, did they ever say what the documents contain? Well, no. One was produced in discovery. The reason they didn't is because it was an intentional and strategic move. Disagree. It was produced in discovery. So the government knew it was important. It's a basic accounting document. It's described with great detail and specificity in the application, which is all that's required under the rule. He did more, I think, than is required. I mean, this is like a search warrant, the way this is written. It's very specific. You know, given this one out, the court's reason, you could never get a search warrant issued. Additionally, it was discussed during the cross-examination of Patricia Rodarte, who was the accounting manager at Highlands. Further, after trial, we get this when the court actually says, you know what, I might have screwed up. I'm going to grant the subpoena now. In the end, it should be noted, the court only granted as to this one item, despite the fact that Mr. Lester requested a whole plethora of stuff, like I think five things, categories of things, that were very specific. They were not general. I disagree. That's just a misuse of the word general. And when Highlands responded, they knew, one, exactly what Mr. Lester was requesting. They knew that there were some out there, and they said, we don't have them now. What there might have been created within this very specific time frame doesn't exist now. If I had, you know, we've got some high school students here in the courtroom today, and if I said, you know, Judge, I'd like your records of how many times you cheated on your SAT or your LSAT, what you would say, I assume, is I never did it. There's no such thing. But if you said, well, the records of my cheating, if they were around, they're not around anymore, that's a very different answer. And I think given that answer, Mr. Lester was able to show, he would have been able to show prejudice, because the government would not have been able to argue in closing, the reason we don't have these records is because they don't exist. They never existed. Because they did, in fact, exist. And you can see that. I think it's number four in Highlands' declaration in response when the subpoena was, in limited form, finally granted. Maybe you ought to move to your second issue. Well, with regard to the Brady violation, sure. Right. Because you've already given us your argument then on the other one. So with regards to the Brady violation here, you know that there's privity of counsel. I'm just sort of touching on the points that I've already addressed. The government was aware that this document existed, or that it existed at one time. They were working with Highlands. They were under duty to ask Highlands, because Mr. Lester had requested these things pre-trial. And, in fact, if they assert privilege, I think it's conceded that there was some communication between the two. And there was document sharing. Highlands was happy to have Mr. Lester prosecuted. They were in the middle of suing him. It was a very contentious relationship. It's still ongoing. And the government should not have been able to argue to the jury, hey, the reason there's no documents here is because they never existed, when, in fact, and in truth, they had. They just didn't maybe exist anymore, at least after trial. We don't know when they were destroyed or lost. But we definitely know by the time of post-trial they were. With that, I'd reserve unless the Court has any other questions. Thank you very much. Thanks.  My name is Henry Carbajal representing the United States in this matter. I think it may help to just briefly explain sort of the core of the case and why the claims with respect to these inventory reports and some of the other claims that the defendant has made are in the district court's words a red herring or didn't matter or irrelevant. Mr. Lester stole over $300,000 from his employer, and he did it through a series of financial transactions from the general account to credit card accounts that belonged to his employer, Highlands. Money flowed across two PayPal accounts and landed in his personal account. Now, the important thing about that money landing in his personal account is that it was not spent on inventory, period. That was shown at the trial. Instead, it was spent on things like cash withdrawals and official check purchases, Mr. Lester's credit card payments, property expenses for Mr. Lester, and even some investments for Mr. Lester, including his E-Trade account. Furthermore, there was testimony at trial that $300,000 in the relevant time period of inventory from some outside vendor, not the normal course of business, that didn't happen, and that was clear in the testimony. And that's why when we get to these, the post-trial motion and those proceedings, the court, the district court, one, made repeated comments about the evidence of theft being overwhelming, but also, second, that these items that Mr. Lester strategically and intentionally held on to didn't matter. They weren't relevant. They weren't material. They didn't move the needle in any way because of the core of the theft that occurred. What would those physical count adjustment reports show? Well, we're not sure at this point if they're even a category of document. Hyland's indicated in their post-trial response that there's no such thing within its system. Now, they also reference in the next paragraph some physical count records. It's unclear. And the district court commented on that as well. And laid the, at the fee, any ambiguities at the fee of the defense because of how they proceeded. These purported documents that came up well after the trial weren't shown to any witness. They weren't given to Hyland's for a sworn response. And so, unfortunately, we don't know exactly. I'm not even sure how to characterize. I can't even conceive that that is an actual category of document at Hyland's because of the way things transpired. I can't speculate as to what, well, in fact, another point is this. I can't conceive they are what Mr. Lester claims because, as also noted during the sentencing proceedings, there was evidence that Mr. Lester fabricated items. We don't know the source of these purported documents. They've never been authenticated. They weren't shown to any witnesses at trial. They weren't shown to Hyland's. What we, what is known, though, from the clear trial evidence is how it occurred, how the money was spent, and that inventory, in fact, didn't come in from some non-vendor source, with the exception of these, the dummy package samples that Mr. Lester sent from Visalia into the Hyland's warehouses and put a false label for a false company on it. Well, what is unspecific about a demand for a document to describe Hyland's physical count adjustment report for each month? What's unspecific about that? I don't know if the problem was specificity so much as asking for categories of documents, because the district court also noted that that was a defect in the application as well. Now, is your, is your point that you have to first make some proof that the document exists before it can be produced? The court, the district court did note that. And there is case law that I cited in the brief of the Morris case from another circuit that speaks on that point precisely. I believe you do in order to show those three prongs, relevance, admissibility, and specificity. And it can't be just wide categories of documents. That's also clear from the case law. That's the Reed case. Because his, his position is that the inventory was there, that he did deliver it from an outside source, and you had records that showed it. And your position is the records didn't exist. Isn't that right? Isn't that the argument? That the, so the inventory never showed up. That is clear from the trial testimony. That's what you say. That's not what he says. He says that the inventory did show up and it's in your physical count adjustment report. And you say there ain't no such thing as a physical count adjustment report and there's no evidence that there ever was one. And then he shows up at post-trial with one of those documents. And was there any adjudication as to whether that was an authentic document of Highlands? There was not, no. And so the evidence at trial was clear that there was no inventory that came in from non-approved vendors. There were only five or six vendors that they had during the relevant time period, all of which were able to be identified by the Mr. Rodarte who testified. And the only thing that came in from one of those, from a strange source, was Mr. Lester's American Products Roots. So there was not inventory that came in. So is that the only report? Is that the only physical count report, adjustment report, the one that they came in with? Are you talking about Defense Exhibit B? Yes. Is that the only one? Well, that's what they called it. They called it a physical count adjustment report. When it's actually presented to Ms. Rodarte, she calls it an inventory receipt report. And that's what makes this, it was very, there were a lot of unknowns with respect to what the defense was asking for and how they were characterizing things. And it continued all the way until the sentencing where they were making certain representations and extrapolations of these documents that no one had seen before. And the Court noted that and noted that, I think Your Honor asked, well, was there any explanation as to what these were? And the answer to that is no. And the district court noted, and this is at SCR 49, that because of the way things proceeded, the strategic and intentional withholding, he determined that we're not going to, quote, unquote, jump through hoops because Mr. Lester had come forward with these things way later and didn't link them up to anything and didn't, didn't authenticate them, didn't do any of those things that you, that one might have expected. I would point as well, too, that it's clear from the sentencing transcript that the defendant had these during the trial, before that, and they said it was a strategic decision. They didn't say, I understand in the briefing, and I believe Mr. my, opposing counsel alluded to this in the presentation, in his presentation, that they somehow came up after trial. That's not what the transcript shows in the representations by defense counsel. They, it was a strategic decision not to come forward with them during the trial. They had them the whole time and chose not to present them to the witnesses that you would think naturally they would present them to. When you say them, trying to read the transcript, is there any idea they had anything more than Exhibit B? That Hyland's? Yeah. No. Is there anything more that suggests that, that the defendant had any more than Exhibit B? I don't believe so. During the trial. I mean, you're saying them. That's the idea. They had some, they had the very things they wanted and they were using them in the trial, but I didn't see that in the transcript. They didn't present them at. What's them? I'm sorry. Exhibit B? Defense presented Exhibit B. Right. And the first time they referred to it as a physical count adjustment report was at the trial. Okay. That's what you're talking about then. Yes. Exhibit B. Correct. Nothing more than Exhibit B. Correct. Not at the trial. In fact, nobody's come up with what's more than Exhibit B, even to this day. Correct. Was Exhibit B presented at the trial? It was. It was. Who was the witness who was examined as to it? It was presented to former Highlands employee Patricia Rodarte. And did she authenticate the Exhibit B? She did. She did authenticate Exhibit B. She called it, though, and there were some leading questions from defense counsel kind of looping in this term, physical count adjustment report, but when she identified it, she called it an inventory receipt report. She called it something different. But that's Item 2 in the subpoena application, Highlands Inventory Receipt Reports from October 2010 through December 2011. Correct. And did she also testify there were other reports? They didn't ask her that, did they? She wasn't asked. She was presented as a prosecution witness? Yes. This was on cross-examination. Cross-examined? This was during cross-examination. That's when she authenticated Exhibit B? Correct. Yes. The government did not introduce Exhibit B. It was the defense. And she was not asked if there were other inventory receipt reports? I don't believe inventory receipt report. No, I don't believe she was asked that. Was she asked about the physical count adjustment report? She was asked about Exhibit B and what the columns represented for Exhibit B and how it related to the American product shipment. I believe that was Exhibit, government's Exhibit 8. She was asked general questions apart from that on how she tracks her inventory. And I believe there was a leading question on, do you send physical count adjustment reports out monthly? And she didn't say yes. She said to Anthony. I wasn't told, one can presume from that, maybe there was some type of inventory document. But importantly, in that examination, she indicated, because there were some representations made in the briefing from the defendant, that these physical count adjustment reports came from the American contractor program. She said she didn't have access to that inventory program. Instead, she kept the inventory, track of inventory on her own. She had her own method. So whether that particular category or term relates to her own private, on-the-ground warehouse method of tracking what goes out with the crews and vans to various sites, it's unclear. What is clear, again, however, is that there wasn't $300,000 of new inventory from some vendor they didn't know that came in during the relevant time period. That was the prosecution testimony. But the defense testimony was that if these documents were produced, they would show that they did have it there. That's what they say, yes. That's what they claim. And that's what defense claims. Sorry, sir. That's the claim now. That's the claim now, correct. Not the claim at trial. No, it wasn't. The only thing presented in this regard was Defense Exhibit B, and there was nothing else presented from the defense on this area. Well, that's because the subpoena wasn't issued. The subpoena was issued post-trial. Post-trial, correct. And nothing further was produced post-trial to respond to those requests? Not from the government and not from Highlands, with the exception of the Highlands declaration. That's at SCR 293 and 294. The post-trial subpoena was answered by saying, these documents don't exist. It was answered. So when the defendant sent the post-trial subpoena and got it authorized, they attached Defense Exhibit B as an example. The declaration in response explains Exhibit B, how it came about, whether there's any other documents like it. The answer was negative. And further explained why there aren't other documents. And I would look at paragraph 5, which is at SCR 294, which explains how Mr. Lester did the transactions. They were posted to certain accounts that didn't have a paper trail. And that's why no other documents were generated because of how the transactions were posted. It wouldn't have generated any other documents. But moreover, and they indicated what was, what ended up in inventory and why it's in a report is, it was a very unique circumstance. I think Ms. Rodarte also testified that this package just showed up unannounced. And so that portion of it made it into an inventory and generated that report. But there were no other instances of that. Thank you very much. You've got four minutes left, haven't you? I ask the Court to affirm the decisions of the district court below. Thank you. I just want to direct the Court to ER page 123. You know, for a long time, people didn't think black holes exist, and they do. And it's the same thing with these physical count adjustment reports. So she's being questioned on a stand. She said, you emailed physical count adjustments to other employees. Yes. And the monthly physical count adjustment was provided to accounting. Is that correct, her answer? That could be a yes and a no. We had two different, there were two different types of methods. I had my method, where I kept track of my inventory. And then there was the American Contractor, which is a proprietary system. I put it in a footnote in my brief, which had a different tracking system that I had no access to. So what I reported is what was a physical count of our inventory. And then that goes on about an email chain and so forth. The point here is, these records existed. It was clear to everyone that they existed. Highlands was very aware of what they were. And in terms of, I want to jump ahead to something that opposing counsel said about their answer number five, where they had, they sort of provided some exposition about what they thought Mr. Lester's role was. There's a very acrimonious relationship. They're suing him, so of course that's their position. But the paragraph before that is the important one, number four, where they say, look, we might have had these things, but we don't have them anymore. That's the important part. In terms of the fact that whether there was just this one, I don't think that's true. And when Mr. Lester submitted his post-trial application, it didn't just have Defense Exhibit B. There were some of these monthly reports that are sort of a larger extrapolation of what's included in just this one physical count adjustment report. The bottom line is, if someone's accused of stealing, and they want to prove they didn't steal, and they ask the person from whom they're accused of stealing, who has those records to turn them over, they ought to be allowed to do that. And if they don't turn that over, if the district court doesn't command them to do it, I think their Sixth Amendment right to present an offense under California v. Trumbetta has been denied. And unless the Court has further questions, I'd submit it. Thank you very much. And thank both counsel for a very illuminating argument. Thanks, Your Honor. And we'll go to the next case on the calendar.
judges: Bea, N.R. Smith, Mãrquez